IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>　　　　　　　　　Complainant<br><br>-v-<br><br>**ISAAC ANTHONY THOMAS,**<br><br>　　　　　　　　　Defendant. | Criminal No.: 1:23-cr-00069-CKK<br><br><br>**AFFIDAVIT OF TRENISS EVANS** |

**Affidavit and Sworn Report and Statement
of Treniss Evans Legal Advocate for Isaac Thomas
Regarding The Mental Health Evaluation**

**Statement of Treniss Evans Condemned USA Legal Advocacy**

I Treniss Evans respectfully submit and seek the audience of this honorable court for the purpose of the truth and facts related to the matter of Mr. Thomas as it relates to his conditions, bond, mental health, & Genesee County court cases.

I submit the following in the interest of facts and truth to guide this matter for the purpose of accuracy as we are discussing the serious matter of bond revocation. I was taken aback and skeptical in relation to what seemed to be nothing short of a self-inflicted and unnecessary disaster through what could easily be misconstrued as willful defiance.

Mr. Thomas while challenging to work with at times is simply young, bold, rightfully fearful, and in need of support not incarceration. Mr. Thomas like most "adult youth" at the age of twenty has a lot of growing to do and needs a network he has never had but is now available to him providing this court shows compassion for this young man and enables him to continue growing as a man while awaiting his trial.

Mr. Thomas is not willfully defiant; he is not attempting to circumvent this court. Mr. Thomas navigated such treacherous waters at such a young age and prior to the interested parties engaging he was doing it all alone.  He is no longer alone; however, we are recognizing the areas where Mr. Thomas simply needs guidance.

Together numerous advocates are working with Mr. Thomas to bridge the gap between the

misconceptions about his compliance.  We serve in this capacity not to explain away reality but to bring this court to the accurate conclusion of the events the government mistakes for defiance.

Had I not had the time to properly investigate both sides of the story, contact the third parties, collect the records provided in this document I would be as lost as the parties who are bringing the revocation efforts against Mr. Thomas.

I can swear before this court that I have spent no less than twelve hours reviewing the facts of this revocation case before preparing the statements I make in this affidavit. I firmly believe with no reservation as the person who has objectively worked to review this matter this court would be providing a great injustice by revoking this bond for numerous reasons.

1. I, Treniss Evans, was asked to investigate – factually – the miscommunication, confusion, and misinformation offered by Pretrial Services out of Michigan and apparently the District of Columbia offices concerning Isaac Anthony Thomas.
2. I am an adult over the age of 18 years old and legally able to make this affidavit sworn under oath.
3. I am legally able in all other respects to make this affidavit sworn under oath.
4. I swear under oath that the factual details provided herein are true to the best of my knowledge and belief.
5. To try to facilitate Isaac Anthony Thomas' transition to a reliable job and living place in Texas, I spent nearly one hour on the phone talking to the Pretrial Services Agency Probation Officer Andrea E. Jarois, and understanding the wishes of U.S. Pretrial Services and coming to a suitable arrangement.
6. Already serving as the legal advocate for Mr. Thomas, I was asked by the John Pierce Law P.C. law firm ("JPL") to factually investigate these issues and provide a detailed finding related to my investigation.
7. I spent many hours and lots of effort not only in my communications and conversation with Andrea Jarois but also with Isaac Thomas and others to make certain that we understood what Andrea Jarois was asking for and making certain that every detail of what was required was accomplished as desired by the Pretrial Services Agency.
8. Andrea Jarois was completely informed of every detail and fact and arrangement.
9. Pretrial Services was completely satisfied with every aspect and every detail of Isaac Thomas plans, arrangements, actions and agreed to all that we discussed with the looming stipulation of compliance for a mental health evaluation to be completed either in Texas or Michigan in a timely manner.
10. Again, I say this not second-hand or from inference.  I say this from directly talking to Ms. Jarois for the express purpose of fully understanding what Isaac Thomas needed to do and making sure that everything that was happening would be satisfactory to Pretrial Services.
11. These arrangements and circumstances and actions were satisfactory.
12. And then suddenly they were not.
13. I am offering to testify by video conferencing to provide this information directly to the Court. I can appear before the court with adequate notice.

14. Initially, Isaac Thomas obtained a mental health evaluation in Michigan according to Isaac and to that matter I am unable to elaborate as it was not in the scope of what I was asked to perform on Mr. Thomas' behalf.  I can represent with great certainty that Mr.Thomas performed an/another evaluation in Texas.
15. Pretrial Services says in effect "not that kind of evaluation, we had something else in mind."
16. Thus, I attempted to clarify this confusion where Pretrial Services determined that Isaac Thomas did not get the *kind* of evaluation that was acceptable.
17. The record of this case shows that JPL in a pleading filed June 28, 2023, questioned both (1) what kind of evaluation the Court or the Pretrial Services is looking for and (2) what purpose this evaluation is supposed to serve.  The Response of JPL on June 28, 2023, explained that while it seems simple enough to get "an evaluation" to lay persons, in fact professionals protest that they need more specific guidance than that.  The professionals Isaac Thomas approached balked that there are different kinds of "evaluations" and they need to know what they are looking for, what is the purpose of the evaluation, what triggers the request for an evaluation, what is the background that may be clues for the existence of a problem?
18. To the best of my awareness, no clarification of this was ever provided beyond a mental health evaluation which for clinical purposes is extremely vague. I represent this after speaking to numerous clinical professionals who all find the request to be overly broad.
19. Normally, a patient who believes he might need mental health assistance or other family or authorities who believe it would provide specific examples of experiences or warning signs or behavior that raise the issue of a need for a mental health evaluation.
20. Here, however, we have never been advised of any such set of reasons or past experiences that could be provided to mental health professionals as medical history.
21. The only reason that we have heard any reference to for the mental health evaluation desires appears to be Andrea Jarois' – or her supervisors –  and recently this court, disagreement with the policy of the State of Michigan in authorizing medical marijuana therapy.  No other basis has been suggested to the best of my understanding.
22. Therefore, when contacting mental health professionals, they quite routinely and naturally want to know the background, Isaac Thomas has no reasons to give them why he should be getting a mental health evaluation or about what.
23. While traveling from Michigan to Texas, Isaac Thomas searched for and found a mental health clinic near his intended new home, the Texas Health Seay Behavioral Health at 6110 West Parker Road, Plano, Texas, and made an appointment for a "Behavioral Health Evaluation" at 11:00 AM CDT (asked to arrive 20 minutes early to fill out papers) on July 31, 2023.
24. It is undisputed that Isaac Thomas attended the appointment on July 31, 2023, at 10:40 AM CDT for the "Behavior Health Evaluaton."
25. However, this process before the Court appears to have then broken down over terminology.
26. When Texas Health Seay Behavioral Health found no basis for Isaac Thomas to receive any further treatment or therapy, they dutifully informed him that he could receive any further therapy that he might desire from the other services in a brochure.  They handed him a

brochure.
27. Pretrial Services then confused and misinterpreted the precaution of telling everyone that they can talk to someone if they desire into a finding that some further treatment was required.
28. No reason for Isaac Thomas to receive any further treatment or therapy was identified.
29. Pretrial Services confused the precaution or policy of handing everybody a brochure with Isaac Thomas being recommended for and refusing treatment.
30. Mr. Thomas is supposed to be honest for an assessment to work and be effective. Representing that he is not interested in, nor does he want to be under the care of a program is not refusal, it is honesty.
31. Thomas was only told that if he had any desire to talk to anyone or has any problems, here is a brochure of other facilities he could reach out to.
32. No direction was provided that Thomas contact any other mental health or medical office, practice, clinic, or facility.
33. Therefore, there was no "referral" for Thomas to contact anyone, much less for any particular reason.
34. I spoke to the Director of the Texas Health Services Behavioral Health in Plano, Texas, about Isaac Thomas' visit for nearly fifteen minutes specifically about this matter.
35. Isaac Thomas has further provided Pretrial Services with his authorization and medical release for Pretrial Services to obtain all of the records of Texas Health Services Behavioral Health concerning his case and visit.
36. Mr. Thomas completed a mental health evaluation at Texas Health Services in Plano, Texas, on July 31, 2023.
37. Mr. Thomas was ruled competent by a Judge in the state of Michigan to be ruled emancipated and capable of caring for himself at the age of sixteen.
38. Mr. Thomas suffers from a mild disability in the form of a speech impediment, that should not be misconstrued to burden him with exceedingly invasive mental health evaluations.
39. The director at Texas Health Services confirmed the Mental Health Evaluation Mr. Thomas completed has four options for treatment recommendations or referrals and is conducted by a clinician for the purposes of assessing the potential need for the recommended level of care.
    a. Intensive Inpatient Psychiatric Care (IIC)
    b. Intensive Outpatient Psychiatric Care (IOP)
    c. Combination of Outpatient and Inpatient Care (Combo)
    d. Provide information where an individual who does not meet the needs of one or more of the above with information where they can seek care on their own if they so choose.

40. But Isaac Thomas passed the evaluation "with flying colors" and needs nothing further.
41. Mr. Thomas in good faith has made every effort to acquiesce to the conditions set by this honorable court.
42. The fact that Mr. Thomas does not wish to seek mental health services beyond the request of this court should not be cause for revocation of bond.

43. My initial interpretation of the form I read aligned with Ms. Jarois' opinion and we were both misled by what appeared to be very plain English, however this is not as simple and required additional review and understanding. That understanding came from the facility clinical director.
44. No basis was found for Isaac Thomas to receive any further treatment or therapy.
45. The Court should hear from the Director of Texas Health Seay Behavioral Health in Plano, Texas before making a ruling on this matter if the efficiency and accuracy of these statements are in question.

Regarding Mr. Thomas, eviction:

46. The last hearing was on July 2, 2023.
47. The Michigan court records show that on July 5, 2023, the landlord filed for an eviction.
48. The Michigan court records show that the Court there signed the eviction order on July 6, 2023.
49. Therefore, Isaac Thomas could not have discussed in the hearing on July 2, 2023, an eviction order filed on July 5, 2023, and signed on July 6, 2023.
50. Isaac Thomas knew that he had fallen behind, including in that he was waiting for a stimulus check which ultimately arrived and paid off the majority of his rent balance. He reports that he also paid $830, leaving a shortfall of $80. He reports that he had been discussing with his landlord that he would become current and asked for her accommodation for him to work and come up with the remaining $80. He reports that he expected that he could work that out so that he would not be evicted.
51. Also, I believe the Court needs to be aware, as I think Pretrial Services is also aware already, that Issac Anthony Thomas was until last month (when it went to trial) one of four victims and complaining witnesses in a criminal trial involving matters of personal violation that he has hoped not to publicize.
52. As a result, Thomas' schedule trying to deal with these issues in Michigan was strongly divided with having to be in court as a witness, including waiting available to be called, and being present for closing, jury deliberation, etc.as one of four complaining victims.

Regarding Mr. Thomas and his alleged move to Texas

53. Mr. Thomas seeks the understanding and compassion of this court to best serve the interests of his successful future available in Texas. The motion was filed in this court for the purpose of relocation where opportunity was available to a young man with very few options.

54. Mr. Thomas respectfully seeks the favorable outcome of this court's decision empowering

him to have gainful employment, a stable home environment, mature adult guidance, and faith-based interactions. Counsel, his legal advocacy, and interested parties believe this to be the first step for Mr. Thomas to rebuild his life, and quite possibly for the first time experience an emotional support system and community that embraces and guides his actions.

  a. Mr. Thomas had the permission of his pre-trial services officer Andrea Jarois to travel to Texas with the understanding he had a safe and compassionate family willing to allow him to stay on their property, use a vehicle, and access to employment opportunities.
  b. Mr. Thomas made this temporary transition, gained the expected employment arrangements, works full time and is working on the plan to rebuild his life as depicted to pretrial services.
  c. Mr. Thomas engaged his legal advocacy for the purposes of assisting in funding the trip and working through the details with Ms. Jarois.
  d. Mr. Thomas sought the guidance of his legal advocate to assist in navigating the rules and remaining compliant through the process as well as witness to his communication with Mr. Jarois.

55. Thomas has been evicted from his apartment in Michigan, lost all his furniture that he had to leave behind, and lost about half of his clothing and personal belongings which he could not fit in the car yet he remained committed to a fresh start pending the courts approval.

56. There is nowhere for Thomas to live in Michigan at this time.

57. Isaac Thomas contacted me on the morning of July 27th in the early morning hours around 5:00 am to work with his pretrial services in hopes of gaining necessary the permission to travel to Texas as it was seemingly the best option. Unfortunately, the situation was exceedingly desperate with a looming eviction and what appeared to be a point of no return from my recollection.

58. Ms. Jarois happened to text Mr. Thomas as I recall, at this time, Mr. Thomas asked if I would have a conversation with Ms. Jarois regarding the potential to make the trip to Texas and remain in compliance. I was pleased to attempt to assist as his advocate and agreed to try to communicate with Ms. Jarois by phone.

Unfortunately, Ms. Jarois has not had the amount of time I have been afforded to spend on a single case of this nature. I am committed to the idea that pretrial services would find the same conclusion if only Ms. Jarois like many government employees were not overloaded and unable to dedicate what would be an unreasonable amount of time to this, a single case.

Ms. Jarois is someone I believe to be fair and balanced and should be asked after reviewing the newfound facts if she still carries the same recommendation. Ms. Jarois may simply believe the statements and representations she has made but more importantly this is simply an error, the

very same error I made at the first look into the matter.

JULY 27th Communication

I initiated communication according to my records with Mr. Jarois at 6:01 am on July 27th. I explained who I am and what I do for the purposes related to Mr. Thomas and his unique situation. Ms. Jarois and I exchanged pleasantries and began discussing what was best for a young man in his position and what would make the most sense. We reviewed his options and concluded the current situation to include no transportation, no job, and homelessness in Michigan were less than favorable and a unique opportunity for a better life than possibly anything Mr. Thomas had available to him in that moment awaited him in Texas.

We discussed the need to be compliant with the court for the numerous aspects of the mental health evaluation, how that would be paid for and if Medicaid would pay for such services, the court, or my advocacy group Condemned USA. We were unable to gain a completely concise depiction and knew that there was work to be done on this looming matter. We discussed the available options for mental health evaluations in Michigan that were unlikely to be able to see him in a timely manner as a soon to be homeless individual.

I suggested to Ms. Jarios that Mr. Thomas had a home with a history of strong Christian values through the temporary and potentially permanent situation in Texas.

The home presented both nurturing guidance, a faith-based family, employment, and a vehicle that was to be at Isaac's disposal for work, court and health related matters. We agreed the interests of Mr. Thomas were best served by a morally grounded network and removal from the illogical elements he may have been influenced by previously in Michigan. The negative impact of influences in Michigan was continually discussed and recognized as a potential for the mistrust and extreme scrutiny Mr. Thomas placed on pretrial services. Mr. Thomas may have appeared to be ridiculous without the unique understanding of Mr. Thomas and his history that Ms. Jarois and I were both made aware of by Mr. Thomas.

Mr. Thomas felt a need to be secure by video recording and having an advocate present on the phone for home visits to safeguard and document his interactions to include at times his pasture whom I located for the initial home visit. We agreed that Mr. Thomas had legitimate trust issues from his experience as a ward of the court related to his childhood.

We discussed getting the young Mr. Thomas on track and remaining or continuing to be compliant. I felt we had made great strides and pretrial services were now satisfied and it was my understanding Mr. Thomas would be given the necessary permission to travel, gain employment and enjoy a temporary stable living situation while awaiting his transfer to what would be the Eastern District of Texas for courtesy supervision. We concluded our call after fifty-one minutes and 24 seconds.

I was on the phone shortly after with Isaac as Ms. Jarois arrived at his residence where he was scheduled to vacate within twenty-four hours. The mental health evaluation was discussed, and Isaac agreed to undergo said evaluation to comply in Texas.

Unfortunately, a misunderstanding resulting from the hurried nature of the events came to light when Isaac found that "court purposes" previously discussed by the vehicle owner meant local court purposes, not trips to Michigan in the loaner vehicle.

AUGUST 14th Communication

I contacted Ms. Jarois on Monday August 14th by text message after failing to reach her by phone at 4:27 pm prior to any revocation motion being filed to discuss the surprising message I had received from Mr. Thomas that appears to have been sent to him sometime in the previous week. This is apparent as Ms. Jarois discusses in the message what appears to be a reference to the looming court date upcoming on Friday and the nature of the message.

I am concerned regarding the disconnect that has developed deviating from the previous discussion I had with Ms. Jarois in July provided in my account of the conversation. Additionally, no discussion of Isaac returning to Michigan occurred to my memory during the visit to the home while I was on the call. The only reference made to that matter is if the court denied Mr. Thomas the ability to become a resident of Texas.

I declare under penalty of perjury under the laws of the State of Texas and federal laws that the foregoing is true and correct to the best of my knowledge, information, and belief.

*Franies F. Evans III*