UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                           :

     v.                                   :   Crim. No. 23-CR-69 -2(CKK-GMH)

CHRISTINA LEGROS                        :

## MEMORANDUM IN AID OF SENTENCING

COMES NOW Defendant, Christina Legros, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and submits that a sentence of time-served would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the goals enumerated in 18 U.S.C. § 3553(a) under the unique circumstances of this case.

### *Procedural Background*

Ms. Legros is before this Court after having pled guilty to one count of Entering & Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). That charge carries a maximum term of imprisonment of 1 year, a fine of up to $100,000, and a term of supervised release of not more than one year.

She was initially arrested on January 30, 2023, in Michigan.  Undersigned counsel does not know whether she has earned any credit for time served as a result of proceedings in the federal court in Michigan.[1]  By the time of sentencing, she will have served, at a minimum, 92 days in jail/prison.

---

[1] The presentence report, which will not be prepared by the time of the filing of this sentencing memorandum, may address that issue.

### *General Background*

Defendant was charged in connection with the "very unfortunate" circumstances that occurred at the United States Capitol on January 6, 2021.

On that date, Ms. Legros, like thousands of others, came to Washington, D.C. Unlike almost everyone else, however, she only came because her then friend/boyfriend, co-defendant Thomas, wanted to hear a speech by the former president.[2]

Ms. Legros has confided in counsel that she was and is apolitical, but because she was excited to be with her friend, co-defendant Thomas, she tried to be supportive of him on January 6, 2021.

This is evident in the words Ms. Legros uttered while she was inside the Capitol or on Capitol grounds that day, as described in the Statement of Offense (ECF Doc. 121).

For instance, when Ms. Legros saw her co-defendant yell "Four More Years" and "Don't Lose Hope!" she replied "all we need is a little hope. Just a little."[3]  When another person cried out "Let me hear a Hell Yeah!" Ms. Legros obligingly yelled "Hell Yeah!"[4]

Ms. Legros' ignorance of the day's events is clearly demonstrated by the fact that her co-defendant had to explain to her, as they walked toward the Capitol, what was happening that day.  She recorded Mr. Thomas say "…where we're going to right now,

---

[2] The Court's interaction with Ms. Legros at the time of her plea should amply demonstrate that Ms. Legros could not have been the impetus for the trip to Washington, D.C., nor for the trip to New York in the few days preceding January 6, 2021.  Ms. Legros appears to lack the drive and ability to travel to almost any destination, and there is no doubt that her friend is the one who drove them to the District, then to New York City, and back to Washington for these events.

[3] *Id*. at 4.

[4] *Id*.

they're going to be voting.  Pretty soon they're going to be having a big hearing.  To decide who's going to be ...[recording ends]."[5]

While she was still outside the Capitol, Ms. Legros remarked at one point that "I just got sprayed in my face and I did nothing."[6]

Thereafter, Mr. Thomas led Ms. Legros inside the Capitol, and when others began chanting "Our House!" Ms. Legros briefly joined in.[7]

At about 2:35 p.m., Ms. Legros, while at the top of the West staircase, shouted "Woo!"  She also recorded others as they entered the Rotunda area.[8]

Perhaps nothing exhibits Ms. Legros' mental state that afternoon better than a remark she made when she was on a balcony looking West towards the Mall and the Washington monument.  Rather than shout a political message or utter a statement indicating her strong feelings about an allegedly stolen election (feelings she did not harbor), when she looked at the scene depicted in Figure 7 of the Statement of Offense, she exclaimed "Oh my God, this is beautiful!"[9]

It appears that Ms. Legros then became lost, as she was no longer in contact with Mr. Thomas for a period of time and walked back and forth between the Rotunda and the East Rotunda Door lobby, purportedly to find him.  Once they reconnected, they went to

---

[5] *Id.* at 5.  If Ms. Legros had understood the reason the two were walking to the Capitol, there would have been no need for Mr. Thomas to explain everything to her.
[6] *Id*. at 6.
[7] *Id*. at 7.
[8] *Id*. at 8.
[9] *Id*. 9.

the lobby outside the Old Senate Chamber.  When others, including presumably Mr. Thomas, yelled "You Serve Us!" and "Our House!" Ms. Legros joined in.[10]

When rioters in the lobby began pushing against a line of officers, Ms. Legros did not join then, but moved back to the Rotunda and the East Rotunda Door lobby, and eventually left the building.

Defendant notes that while at the Ellipse, those listening to the speech had been instructed by various speakers to "fight" to keep the former president in power, and many in the crowd were energized, angry, and spoiling for a fight.  Ms. Legros was not one of those who was spoiling for a fight, as the significance of the moment was obviously lost on her (given Thomas's explanatory statement to Ms. Legros while they walked to the Capitol).

### The Scene Inside and Outside the Capitol that Afternoon

As is clear from the variety of defendants who have appeared in this courthouse in January 6 cases, there were varying levels of participation and action by different people, and groups of people, at the Capitol that day, both on the grounds outside the building, and inside the Capitol itself.

Some, as has been shown in numerous video recordings, were prepared for battle, wearing military-style outfits, carrying different types of weapons (guns, sticks, batons, flagpoles that used as weapons, pepper or bear spray, etc.) and implements of battle (zip ties, rope, etc…).

---

[10] *Id.*

Many of the individuals had also posted messages in various social media platforms before January 6 indicating that it was time for a civil war, and that they would not accept the official results of the election that were certified by the 50 States.

It is fair to say that the crowd, generally, was very angry about the outcome of the election, and strongly disagreed with certification of the votes by various State officials. Some in the crowd had resolved not to allow a peaceful transfer of power to a new administration to take place.

However, it is equally clear that while some in the crowd were prepared for a physical battle, others went there to shout, scream, and protest the official results of the election.

Some entered the Capitol building, while others stayed on the grounds outside the building.  A fairly small number of people used violence to break windows and push open doors so that they, and others behind them, could gain entry to the building.  And while some people witnessed this initial violent entry into the building as it occurred, others arrived after windows had been smashed, and doors had been opened (and barricades removed or pushed aside).

A number of protestors engaged in physical confrontations with police officers, both inside and outside the Capitol.  Some of the interactions were quite violent, and caused injuries to a number of officers.

Other protestors destroyed property or otherwise vandalized some areas of some offices inside the building.

As noted above, many people shouted various chants, and some shouted at the police officers who were attempting, often in vain, to keep the crowd from entering further into the Capitol building once the crowd had breached the perimeter.

Some individuals threw flagpoles, stolen police shields, chairs, frozen water bottles, and other objects towards police officers.  Some gathered in a lower tunnel (artificially created for the inauguration that was to take place on January 20, 2021) and attempted to push their way into the building at that location.

Others sprayed some officers with various substances, and were otherwise very hostile and demonstrative toward the police, aggressively screaming in their faces.

### Ms. Legros's "Actions" that Afternoon

Ms. Legros's actions at the Capitol on January 6, 2021, on the other hand, were about as passive as a member of the crowd could have been that day.

While she admits entering the Capitol and knowing that he was not allowed to be there, based on the images provided in discovery, some of which appear in the Statement of Offense, Ms. Legros only walked to, and into, the Capitol because her co-defendant wanted to.

He clearly knew what was happening in the Capitol that day. Ms. Legros, on the other hand, clearly did not, at least until he made the statement discussed above.  Even then, however, based on her reason for being there that day – to be with Mr. Thomas - as well as her mental state,[11] there is no reason to believe that she truly understood the

---

[11] It is very likely that Ms. Legros was not on any medication that day, or during this time period in general.

significance of her presence, as well as the presence of others, at the Capitol on that day and time.

Ms. Legros never screamed at the police, or taunted them, as some others did.

She never pushed up against a police line, or even joined others in doing so.

She never threw anything at anyone, or even raised her arms or hands.

She did not look angry, upset, or enraged, as many other individuals there appeared to be.

She never encouraged anyone to become violent.

She never urged anyone to enter the building (as some others did quite forcefully).

She never destroyed any property or encouraged anyone else to do so.

She never posted any messages or images or videos on social media glorifying the event or minimizing the significance of the riot.  Many of those in the crowd had, in preceding days, indicated an intent to commit acts of violence on January 6.  Many also brought clothing, weapons, and other gear that clearly showed they came to fight.

Ms. Legros did none of that.

Rather, she was simply "there," following Mr. Thomas wherever he went.  Even then, she lost him several times.  But during those times when she was away from Mr. Thomas, and could have engaged in violent or hostile behavior if that had been her intent, she never did so.   She didn't because that was not her intent.  Her sole intent was to be with Mr. Thomas, and be a good friend to him (so that he would like her as well).

The government correctly notes that if Ms. Legros had committed other criminal acts, she would have been charged with further crimes, such that her failure to commit any other criminal acts does not merit any consideration.

While that statement is partially true, the fact is that of all of the people who were in the Capitol on that day, Mr. Legros's actions were at the very bottom rung of criminality.

### *Analysis of Sentencing Factors*

As this Court knows, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, they are not even presumptively reasonable.

In determining an appropriate sentence, this Court must consider the factors delineated in 18 U.S.C. § 3553(a), and impose a sentence that:

1) reflects the seriousness of the crime;

2) promotes respect for the law;

3) provides just punishment;

4) deters criminal conduct;

5) protects the public from further crimes, and

6) provides the Defendant with any necessary educational or vocational training, medical care, or other correctional treatment.

In addition, this Court must also consider

1) the nature and circumstances of the offense;

2) the history and characteristics of the defendant;

3) the kinds of sentences available;

4) the sentencing range;

5) the need to avoid unwarranted sentence disparities among

   defendants with similar records who have been found guilty of

   similar conduct, and

6) the need to provide restitution to any victims of the offense.

### *The Proposed Sentence Would Reflect the Seriousness of the Crime*

This memorandum has already addressed the "seriousness of the crime."  It has

argued that compared to the conduct of all of the other defendants who entered the

Capitol on January 6, 2021, Ms. Legros's conduct was about as innocuous as any conduct

could have been.

She did not assault anyone, destroy any property, push any officers, help others

push any officers, throw any object, raise her fist or arm in anger, shout at or berate any

law enforcement officer, remain in an area after she was told to leave, or post any boasts

or claims on social media.  She also did not give interviews to any news outlets

minimizing what happened.  Finally, she did not destroy any evidence of her

participation, as many others did, because she truly did not understand the significance of

that day's events.

She entered the Capitol well after the doors she went through had been breached,

such that she was not there when the breach occurred.  She followed Mr. Thomas

wherever he went, except when she lost him in the crowd.  When she ended up in a

certain area inside the Capitol, she did not know which areas were (usually) public or

sensitive.  Moreover, other than her trespass, she never participated in any criminal

actions undertaken by others in that vast crowd.

In light of that, she submits that a sentence of time-served would be sufficient, but

not greater than necessary, to achieve the goals enumerated in 18 U.S.C. § 3553(a).

The government will likely argue in its sentencing memorandum that despite her

lack of violent conduct that day, the violence committed by others in the crowd was

facilitated by the presence of many persons like Ms. Legros.

That may or may not be true.  Some of the individuals at the Capitol that day were

determined to commit acts of violence regardless of who was there.  Ms. Legros cannot

be blamed for that.  And the fact that she unlawfully followed Mr. Thomas into the

building did not irresistibly compel any other person to assault a police officer or destroy

property.

Counsel recalls the protest marches in January 20, 2017, when hundreds of

thousands of people marched to protest the election of the former president.[12]

During that march, some in the crowd stepped a few feet away from the larger

group and broke large plate glass windows in banks and in coffee shops.  One could

argue that the mere presence of so many angry or passionate people in the crowd of

marchers on January 20, 2017, somehow emboldened these (apparently Antifa, based on

their clothing) individuals to become violent, but that would not be a fair assessment of

---

[12] Undersigned counsel represented two separate defendants in connection with that prosecution – one person who was merely marching with the crowd, and another who allegedly broke a huge plate glass window at a Bank of America branch.  Thus, counsel is intimately familiar with the facts underlying that prosecution, and is able to make an informed comparison between that event and this one.

the alleged role of the crowd in that march.  Nor is it fair to impute the actions of a few others to Ms. Legros's mere presence.

While it has become a common refrain in January 6 cases to say that "a mob isn't a mob without the numbers," someone who did not attack any police officers or destroy property should not be automatically accused of unwittingly encouraging troubled individuals in the commission their acts.

Given all of that – her minor role in this event and her state of mind (suffering from mental health issues, her desire to please her co-defendant friend, her utter lack of understanding of the constitutional issues that day, and her impressionability), a sentence of time-served is more than enough to achieve the goals of the sentencing statute.

In fact, it is very likely that if Ms. Legros did not suffer from any mental health issues, she never would have been imprisoned and sent to a Bureau of Prisons facility. Rather, she would have remained free pending her plea and sentencing, and she would have likely received a probationary sentence based on the facts of this case.  Because of her mental health issues, however, she has paid for her crime much more severely than she otherwise would have.

With respect to supervised release, defendant asks that no period of supervised release be imposed.  First of all, as just noted, she has served much more time in jail than she should have, and that solely because of her mental health issues.  Second, she is from Michigan, and although supervision could be transferred to that state, any violation would result in her having to come back to the District.  Because her mental health issues are likely to remain with her, and because she will likely be homeless, any violation could

only be addressed once she arrived in the city, and that would very likely happen the same way it happened this time – she would be arrested in Michigan and brought to the District.  That is a process that normally takes at least 30 to 45 days.

Third, Ms. Legros has had a case manager in Michigan in the past, and she will reconnect with that person when she is returned to Michigan.  That state can then monitor her mental health, and take any course of action it deems appropriate.  Placing Ms. Legros on supervised release, therefore, would, in the event of a violation, raise a host of issues that would almost certainly result in her further incarceration.  That is not necessary given the already-lengthy period of time she has spent awaiting the outcome of her case.

Defendant also asks that this Court not order restitution (normally $500) or a fine, given her indigency and her personal situation.  The Court is required to impose a $25 special assessment, and undersigned counsel will work with Ms. Legros's mother to make sure that that sum is paid to the Court.

### *The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Ms. Legros, and Deter Criminal Conduct, both by her and by Others.*

 These three goals would be met through the imposition of the proposed sentence under the particular circumstances of this case, for the same reasons presented above.

Notably, and perhaps counter-intuitively, respect for the law is actually *diminished* when a sentence is unfairly high.  Here, people following Ms. Legros's case could fairly wonder why someone who walked into the Capitol, followed her friend to various places, meekly repeated certain chants, and walked out when her co-defendant

was ready to leave should receive more than a probationary sentence.  Those same people would likely be upset to learn that she has spent more than three months in jail simply because her mental health issues prevented her from participating in the normal pretrial process.  Any sentence that exceeds time-served would not be just or fair.

### *The Need to Protect the Public from Further Crimes*.

This Court, while concerned about crime in general, is charged with dispensing justice relating to the District of Columbia.  It has no jurisdiction outside of the city, nor would it want to have such jurisdiction.

Here, Ms. Legros will be sent back to Michigan following the expiration of any sentence, and she will continue to live there, as she done her whole life.  There is need to protect the public in Washington, D.C. from any further crimes that may be committed by Legros, and any issues she may encounter will be addressed in the state of Michigan.

### *The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment*.

Defendant surely could benefit from mental health treatment and vocational training.  However, because she will be living in Michigan, social services in that state will be able to assist her as best they can.  Again, there is nothing else this Court should do.

### *The Need to Avoid Unwarranted Disparities*

This factor is often the most difficult one to evaluate, given the differences between defendants in cases such as these.

To assist the Court in determining the most appropriate sentence, undersigned counsel spent a considerable amount of time compiling the accompanying sentencing information,[13] including the types of sentences every defendant ever sentenced in this District under the relevant statute has received.

As noted, of the 57 defendants sentenced under 18 U.S.C. § 1752(a)( 1) as of April 22, 2024, 10 have received probation alone, i.e., not probation with a special condition of home confinement.

5 others have received sentences of probation or supervised release with either intermittent confinement (i.e., weekends in jail) or home confinement or home detention.

34 defendants have received straight jail time, often followed by a period of supervised release.

Of the 39 defendants who have received a sentence that included imprisonment (either straight jail time or intermittent confinement), 7 were sentenced to more time than Ms. Legros has already served (92 days, or > 3 months).

Those defendants, their case numbers, and their sentences, are as follows:[14]

Bryan Betancur  21-CR-51(TJK)          4 months
Billy Knutson    22-CR-31(FYP)          6 months
Samuel Fisher.  21-CR-142(CJN)         120 days
Deborah Sandoval 21-CR-195(CKK)        5 months
Jia Liu  21-CR-711(TJK)                4 months
Andrew Morgan  21-CR-313(TJK)          110 days
Matthew Huttle.  22-CR-403(CKK)        6 months

---

[13] *See* attachment entitled "Legros.Christina.breakdown.1752.sentences."  Defendant has also attached hereto the entire chart compiled by the Department of Justice showing the sentences imposed to date (as of April 22, 2024) in every single January 6 case, not simply in cases prosecuted under 18 U.S.C. § 1752(a)(1).
[14] The cases are listed in the order they appear on the DOJ's sentencing chart.

A look at all of the foregoing cases demonstrates that Ms. Legros's behavior in and outside the Capitol that day was truly much less severe than all of the defendants whose cases are discussed below.  Hopefully a review of the basic facts underlying these "greater than 3 months" sentences will demonstrate to the Court that a sentence of time-served is appropriate in Ms. Legros's case.

Defendant submits that once the Court reads the following descriptions of these defendants' behavior, it will not need any further analysis comparing and contrasting the behavior of Mr. Legros to that of these defendants.

1) Bryan Betancur, who received a sentence of 4 months, engaged in the following actions according to the government:[15]  a) While on probation, Mr. Betancur twice lied to receive permission to travel to Washington, D.C. to spend time with the Proud Boys at political rallies, first on December 12, 2020, and then on January 6, 2021; b) while at the Capitol on January 6, he climbed scaffolding that had been erected for the upcoming presidential inauguration on January 20, 2021; c)  he entered a sensitive area of the Capitol, specifically, Room ST-2M, which is closed to the public even on days when the public is allowed to enter the Capitol; d) he assisted others in removing furniture from the room, and that furniture appears to have been used by other rioters in a different part of the Capitol grounds as weapons and projectiles against the police; e) he violated the terms of his pretrial release following his guilty plea;

---

[15] 21-CR-51(TJK), ECF Doc. 39, at 2.

f) he lied to the FBI during a post-plea interview and g) he was uncooperative with the probation office as it tried to prepare the presentence report.

2) Billy Knutson, who received a sentence of 6 months in jail, engaged in the following behavior according to the government's sentencing memorandum:[16] a) Mr. Knutson had previously been sentenced to a five-year prison term for felony assault and intimidation with a dangerous weapon; b) he publicly promoted violence and civil war before and after he entered the Capitol building; c) he entered the Capitol building through a broken window; d) he encouraged resistance against the police while at the Capitol; e) after January 6, he used his popular online platform to promote mortal combat in support of his brand of patriotism, and published a music video that includes phrases such as "[w]e may have lost the battle but this fight is far from over. Give me freedom or give me death (making a throat-slitting motion as he utters the second part of the sentence)." Much more could be said about Mr. Knutson, but the foregoing gives this Court an idea of the type of behavior that resulted in the imposition of a 6-month sentence (which seems rather light to undersigned counsel).

3) Samuel Fisher, who received a sentence of 120 days in jail, engaged in the following behavior:[17] a) In the weeks leading up to January 6, 2021, Mr. Fisher glorified and promoted political violence; b) he traveled to Washington, D.C. in

---

[16] 22-CR-31(FYP), ECF Doc. 29, at 1-9.
[17] 21-CR-142(CJN), ECF Doc. 35, at 1-8.

early January of 2021 with the intent to impede the certification proceedings, as well as with reason to believe that the events at the Capitol would turn violent; c) he brought at least two firearms to the Washington, D.C. area though he may not have brought them into the city; d) he encouraged one of his Facebook friends to "bring ur guns" on January 6; e) in the days following the attack, he continued to glorify political violence and specifically the violence that occurred at the Capitol on January 6 and his participation in that day's events. Pages 4, 5, and 7 of the government's sentencing memorandum show photographs of the guns and a knife-like weapon that Mr. Fisher displayed on social media around the time he was discussing violence and an upcoming civil war.

4) Deborah Sandoval, who received a sentence of 5 months, engaged in the following behavior according to the government:[18]  a) She encouraged her sons and others to join her in Washington, D.C. on January 6, 2021, and indicated in private messages that she was thinking of bringing weapons "because this one could be bad depending on the electoral vote."  b) after she entered the Capitol through the Senate Wing Doors, she loudly yelled for Nancy Pelosi to be brought before the angry mob; c) she entered many different parts of the Capitol; d) after January 6, she used social media to glorify the political violence that had occurred on that day, spread disinformation about the riot,

---

[18] 21-CR-195(CKK), ECF Doc. 122, at 2.

claiming it had been peaceful, and boasted about her participation in the riot; and d) after learning that other rioters faced criminal prosecution for their participation in the riot, she deleted evidence of her crimes and told others to do the same.

5) Jia Liu engaged in the following conduct on January 6, and was sentenced to 4 months in prison:[19]  a) He entered the Capitol twice, despite the sound of blaring alarms, broken glass on the floor, and the sight of people climbing through windows; b) after he re-entered the Capitol a second time, he stood at the front of a pack off rioters facing officers; c) he only left the building when police forced him out; d) he destroyed evidence of the events that was on his phone; and e) he was charged with additional crimes while out on bond in his case.

6) Andrew Morgan, who was sentenced to 110 days in prison, engaged in the following conduct according to the government:[20]  a) He joined the riot early, rallying with the front lines as the job assaulted police lines on the upper West Plaza and the Lower West Terrace; b) he actively berated and threatened law Enforcement as they tried to hold the line against rioters; c) he encouraged people to resist being pushed back as they struggled with the police; d) joined other rioters as they pushed against the police at the Lower West Terrace; e) posted on social media after the riot indicating a lack of remorse; 6) was on

---

[19] 21-CR-711(TJK), ECF Doc. 39, at 1-2 and 7.
[20] 21-CR-313(TJK), ECF Doc. 60, at 1-2.

legal restraint on a charge of "interfering with public duties" when he committed his offenses at the Capitol.

7) Matthew Huttle engaged in the following conduct, and was sentenced to 6 months in prison for his actions on January 6, 2021:[21] a) despite acknowledging that the area was closed and that police were guarding the area, he stated his intent to enter the Capitol; b) he was at the forefront of violence when rioters overwhelmed and overran the police line on the West Front; c) he joined the mob as rioters berated officers while violently attacking them; d) while in the Capitol, he disobeyed direct orders to leave; e) while in the Capitol, he assisted others rioters in searching for members of Congress; and f) he has an extensive criminal record that demonstrated a pattern and practice of disobeying the law.

It is amply evident, given the behavior of the foregoing individuals, that Ms. Legros's conduct does not remotely compare to theirs. And it is further proof that a sentence of time-served is amply warranted.

### *Conclusion*

Ms. Legros is a very young lady who suffers from a number of mental health illnesses, and who, to her great misfortune, met and liked a man who believed that the 2020 election had been stolen, and wanted to go to Washington, D.C. to engage in whatever actions he ultimately engaged in on January 6, 2021.[22]

---

[21] 22-CR-403(CRC), ECF Doc. 48, at 2, 18.
[22] Mr. Thomas has not yet been convicted of any offense(s).

She wanted Mr. Thomas to like her, and as young people are sometimes wont to do, she followed him wherever he would let her follow.  And he led her right into one of the worst events in the history of our nation – one that still shakes the nation to its core.

There is no doubt that Ms. Legros was not aggressive or angry that day.  She merely repeated what others said, or joined in with them, surely to support someone she cared about.

As a consequence, she has spent over three months in prison – a prison that is far from her home.

She will face substantial difficulties when she returns to Michigan following the service of any sentence, but as counsel has argued above, the best place for her to address her demons is near her family, not in this city.

Moreover, imposing a period of supervised release, while normally appropriate, would merely set her up to fail in this instance, and likely result in a further period of incarceration were she to violate any condition of release.

She has already served much more time in prison than she would have had were she not "ill."  Enough is enough. It is time for her to go home and attempt to make the best of her life surrounded by family and a positive support system.  Counsel certainly hopes that she can maintain her mental health once she is released, as he has found her to be a sweet person while she is properly medicated (which is the only condition in which counsel has seen Mr. Legros).

In light of the foregoing, defendant asks that this Court sentence her to time-served, with a $25 special assessment.

Respectfully submitted,

/s/

_____

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
E-mail:  sfbrennwald@cs.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by email, this 6th day of May, 2024, to all counsel of record.

/s/

_____

Stephen F. Brennwald